Case 1:07-cv-00170-PAC   Document 57   Filed 12/10/09   Page 1 of 10

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: December 10, 2009

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

ROBERT CARVAJAL,                             :

                 Plaintiff,            :             07 Civ. 0170 (PAC)

   -against-                                      :             OPINION

DONALD MIHALEK, et al.,                      :

                Defendants.          :

--------------------------------------------------------x

      HONORABLE PAUL A. CROTTY, United States District Judge:

      This is an action under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) brought by Plaintiff, Robert Carvajal, who was shot twice by U.S. Secret Service Agents (the "Agents") executing a search warrant in a New York City Housing Authority project, The Taft Houses, located at 70 East 115th Street, New York, New York, at 6:00 a.m. on February 9, 2004.  Previously, the Court dismissed Plaintiff's claims against all of the Agents who were not directly involved in the shooting.  (Order dated January 25, 2008).  The Court also dismissed Plaintiff's supervisory liability claims.  (Id.)  The Court found there to be factual issues with respect to Plaintiff's excessive force claim against U.S. Secret Service Agents Mihalek and Rizza, and their defense of qualified immunity.  The Court held that summary judgment was not appropriate on the excessive force claim, but permitted Mihalek and Rizza to renew their motion on qualified immunity after limited discovery.

**Summary Judgment Standard**

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Once the moving party has made an initial showing that no genuine issue of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(e).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

**The Fourth Amendment and Excessive Force**

Under the Fourth Amendment, the question of whether force used to effect a seizure is "excessive" is judged "under objective standards of reasonableness." Stephenson v. Doe, 332 F.3d 68, 77 (2d Cir. 2003).  The question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances

2

confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Id. at 396.

In "slosh[ing] . . . through the factbound morass of 'reasonableness,'" Scott v. Harris, 550 U.S. 372, 383 (2007), "a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. 396.  Factors relevant to Fourth Amendment excessive force claims include, "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  Saucier v. Katz, 533 U.S. 194, 205 (2001) (quoting Graham, 490 U.S. at 396), overruled in part by, Pearson v. Callahan, 129 S. Ct. 808, 813 (2009).

In Tennessee v. Garner, 471 U.S. 1, 11 (1985), the Supreme Court explained that with regard to deadly force, it is unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead."  But, where "the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical injury, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  Garner, 471 U.S. 11-12; see also Brosseau v. Haugen, 543 U.S. 194, 197-98 (2004).  Garner was, however, "simply an application of the Fourth Amendment's reasonableness test."  Scott, 550 U.S. at 383.  Thus, at bottom, in determining whether a law enforcement officer's use of force – be it deadly or not – was constitutional, the

question remains: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." Graham, 490 U.S. 397; see also Blake v. City of New York, No. 05 Civ. 6652(BSJ), 2007 U.S. Dist. LEXIS 49160, at *8-9 (S.D.N.Y. July 6, 2007) (explaining that "Garner was simply an application of the Fourth Amendment's 'reasonableness' test."); cf. Holeman v. City of New London, 425 F.3d 185, 192 (2d Cir. 2005) ("The question whether the police have qualified immunity for a use of deadly force is likewise governed by the standard of objective reasonableness." (citing Graham, 490 U.S. at 397)).

**Qualified Immunity**

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." Pearson, 129 S. Ct. at 815. The doctrine strikes "a balance between the need to provide a means for the vindication of constitutional guarantees and the societal costs that inhere in litigation against public officials, including 'the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties."'" Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) (quoting Gegoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949)). In determining whether qualified immunity precludes suit against a government official, courts consider: (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right[,]" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 815-16 (citing Saucier, 533 U.S. at 201).[1]

---

[1] Under Saucier, the question of whether the conduct of a law enforcement officer violated a constitutional right was the first step of the qualified immunity analysis. The second step was to determine whether the right was clearly established at the time of the alleged misconduct. Saucier, 533 U.S. at 201. In Person, the

4

In considering excessive force claims such as the one brought by the Plaintiff, the question of qualified immunity turns on "the objective reasonableness of the [law enforcement official's] belief that his conduct did not violate [the alleged victim's] right to be free from excessive force." Salim v. Proulx, 93 F.3d 86, 91 (2d Cir. 1996). This reasonableness inquiry, "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment he made the split-second decision to employ deadly force." Id. at 92. "[E]ven officers who are found to have used excessive force may be entitled through the qualified immunity doctrine to an extra layer of protection 'from the sometimes hazy border between excessive and acceptable force.'" Stephenson, 332 F.3d at 77 (quoting Saucier, 533 U.S. at 206).

The Second Circuit has pointed out that "[f]rom this analysis it appears that at least in some excessive force cases the various parts [of the qualified immunity] analysis ultimately converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." Cowan v. Breen, 352 F.3d 756, 764 n.7 (2d Cir. 2003). Yet, there is a distinction between the question of whether a constitutional violation has occurred, i.e., whether the defendant's use of force was objectively reasonable, and whether qualified immunity applies, i.e., whether it was objectively reasonable for the defendant to believe that his use of force was lawful. As explained in Stephenson, "claims that an officer made a reasonable mistake of fact that justified the use of force go to the question of whether the plaintiff's constitutional rights were violated, not the question of whether the officer was

---

Court held that "the sequence set forth [in Saucier] is often appropriate, [but] it should no longer be regarded as mandatory, Pearson, 129 S. Ct. 818, and that "courts should have the discretion to decide whether [the Saucier sequence of analysis] is worthwhile in particular cases." Id. at 821. "Accordingly, a district court does not necessarily err in addressing a qualified immunity issue by concluding that a right is not clearly established at the time of a government official's actions, without first deciding whether those officials could reasonably be viewed as violating that right." Okin v. Village of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 429 n.9 (2d Cir. 2009).

entitled to qualified immunity. . . . The qualified immunity inquiry, by contrast, concerns an 'officer's mistake as to what the law requires' and acknowledges that 'reasonable mistakes can be made as to the legal constraints on particular police conduct.'" Stephenson, 332 F.3d at 78-79 (quoting Saucier, 533 U.S. at 205); see also Cowan, 352 F.3d at 762.

Qualified immunity is an affirmative defense, and defendants "bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." Varrone v. Bilotti, 123 F.3d 75, 78 (2d Cir. 1997).

**Analysis**

Mihalek and Rizza urge that on the undisputed facts, it was objectively reasonable to use force (i.e., to shoot the Plaintiff) and that, therefore, they are entitled to qualified immunity. The difficulty with this argument is that there are numerous disputed and material questions of fact, even if certain of Plaintiff's factual arguments are ignored.

Plaintiff argues that the informant, who told the Agents that Joseph Carvajal (the Plaintiff's brother) had guns, and that guns would be present in the apartment that was the subject of the warrant, was unreliable. Accordingly, the Agents had no reasonable basis for any concern about guns when they executed the search warrant. This argument must be rejected; it was entirely reasonable for the Agents to believe that a gun or guns might be present in the Plaintiff's apartment, which he shared with his brother, at the time the search warrant was executed. The basis for their reasonable belief was the numerous conversations they had with the confidential informant, tape recorded conversations in which Joseph Carvajal discussed gun sales and admitted to possessing a gun, plus the reference to a gun in the affidavit upon which the search warrant was issued.

During the course of the criminal proceedings against Plaintiff and Joseph Carvajal, Judge Hellerstein conducted a hearing on a motion to suppress the evidence and statements arising out of the execution of the search warrant at 6:00 a.m. on February 9, 2004. The Agents' testimony was that they knocked on the door of the Plaintiff's apartment, and announced their presence in a loud voice. When the announcement went unheeded, the Agents used a ram to enter the apartment. Having heard testimony and argument, Judge Hellerstein concluded that the Agents knocked and announced their presence, that the Carvajal brothers refused to answer the door, and that the refusal was deliberate. In light of this, Judge Hellerstein held that the Agents used appropriate force to gain entry into the apartment. Additionally, Judge Hellerstein noted that Plaintiff admitted to a Secret Service Agent that he knew there were Agents at the door and that he had learned a lesson: he should open the door when law enforcement agents knock. Accordingly, Judge Hellerstein denied the motion to suppress. But even giving full weight to Judge Hellerstein's correct assessment of the issue, the determination is not dispositive of the Plaintiff's excessive force claim.[2]

After knocking and announcing their presence, the announcement being deliberately ignored, the Agents battered the door open and gained entry. Upon entry, two Agents, (Rizza and McIntyre) immediately entered the kitchen area which was located directly to the left of the entry door. Mihalek remained in the doorway.

Both Mihalek and Rizza state that they yelled, "Police, get down," but the Carvajal brothers ignored the direction. Mihalek's memorandum of the incident states that he observed the Plaintiff "acting in a hostile manner and holding a handgun."

---

[2] Indeed, Judge Hellerstein specifically refused to rule on the use of excessive force, as that issue was not determinative of the issue before him. The sole issue before Judge Hellerstein was the legality of the entry into Plaintiff's apartment.

7

Mihalek observed that Plaintiff was moving towards the kitchen area (i.e., where Rizza and McIntyre were positioned).  Accordingly, he discharged one round from his HK-MP5.[3]  One second after Mihalek fired, he heard another gunshot coming from the kitchen area.  And almost instantaneously after the second shot, there were "immediate indications that Robert Carvajal" was shot and needed medical attention.  Mihalek's statement has no reference to a gun or a printer being thrown out of the window of Plaintiff's apartment.

Rizza's memorandum of the incident states that within 2 to 3 seconds of entry into the kitchen, he heard a single gunshot and observed a muzzle flash on the rear wall of the apartment's living room.  As he heard the gunshot and saw the muzzle flash, Rizza states, "Robert Carvajal suddenly confronted and advanced toward [him] in a hostile and threatening manner from the living room area of the apartment."  Rizza shot Plaintiff, believing that he and and McIntyre faced an imminent and immediate threat to their lives and safety.  Immediately after Rizza fired his shot, he observed Plaintiff on the floor area of the dining room, directly adjacent to the living room.  Even though Rizza was in the kitchen where the window was located, his statement has no reference to a gun or a printer being thrown out of the window of Plaintiff's apartment.

During the search of Plaintiff's apartment, Secret Service Special Agent Wackrow was stationed outside of 70 East 115th Street.  Wackrow testified that he saw a gun and printer fall from the Taft Houses approximately nine seconds after hearing the first gunshot. Wackrow testified further that minutes after he saw the gun and printer fall, he noticed that the window to Plaintiff's apartment was open.

---

[3] HK-MP is a 9mm submachine gun manufactured by Hechler & Koch, a German small arms manufacturer.  It is used as an assault weapon by our Special Forces in the U.S. Army.

Plaintiff's version of events paints a different picture. According to Plaintiff and his brother, the Agents never yelled, "Police, get down," there was never a gun or printer in the apartment, and because there was never a gun and printer in the apartment, such items were not thrown from Plaintiff's apartment. Plaintiff notes that the timing of events offered by Mihalek, Rizza and Wackrow make it impossible that he or his brother threw a gun out of the apartment window at the time of the search. In sum, Plaintiff contends that the agents entered the apartment with machine guns and started firing right away.

Mihalek's and Rizza's argument is based on a number of assumptions. First, they start at the end of the factual sequence with the gun and the printer being thrown from the building and the window of Plaintiff's apartment being open. Based on that, they infer that the gun must have come from Plaintiff's apartment. Since the gun must have come from Plaintiff's apartment, it had to have been held by either Plaintiff or his brother. Since a gun was present at the time of entry and there was a refusal to get down, regardless of whether Plaintiff or his brother held the gun (and even though Mihalek places the gun in Plaintiff's hand and no one places the gun in Joseph's hand; and even though if Plaintiff held the gun, given that he was shot twice and the position on which he fell, it is unlikely that he could have thrown the gun out of the window), the use of force here was justified.

It is not established as a fact that the gun and the printer fell or were thrown from Plaintiff's apartment. The assertion is really an inference based on Agent Wackrow's testimony. Even assuming that this is what most likely occurred, it has not yet been established as a matter of fact. And even if it were established, the presence of a gun in the apartment does not mean, as a matter of law, that it was objectively reasonable to

9

shoot Plaintiff. Cf., Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) ("the police officers could not reasonably have believed the use of deadly force was lawful because Cunrow did not point the gun at the officers and apparently was not facing them when they shot him for the first time.").

In the final analysis, it is far from clear what Mihalek and Rizza confronted during the very short time after they entered into the apartment, through the shooting and until the scene was secured. Given the lack of clarity regarding the circumstances confronting Special Agents Mihalek and Rizza at the time of the shooting, it cannot be said – as a matter of law – that their actions were objectively reasonable.

The Court cannot determine "[w]hether in the particular circumstances faced by the officer[s], a reasonable officer would believe that the force employed was lawful." Cowan, 352 F.3d at 764 n.7. It is not appropriate to grant summary judgment on a claim of qualified immunity where there are genuine questions about both excessive force and qualified immunity. The motion for summary judgment is accordingly DENIED. The Clerk of Court is directed to terminate the motion for summary judgment, document number forty-two.

Dated:  New York, New York
        December 10, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge